NUMBER 13-10-00534-CR

 

COURT OF APPEALS

 

THIRTEENTH DISTRICT
OF TEXAS

 

CORPUS CHRISTI – EDINBURG

                                                                                                                             

 

DAVID FRANCISCO BARRON,                                                   Appellant, 

 

v.

 

THE STATE OF TEXAS,                                                               
Appellee.

                                                                                                                             

 

On appeal from the 377th
District Court

of Victoria County, Texas.

                                                                                                                             

 

MEMORANDUM OPINION

 

Before Chief Justice
Valdez and Justices Rodriguez and Garza 

Memorandum Opinion by
Justice Garza

 

            A jury found appellant,
David Francisco Barron, guilty of aggravated robbery, a first-degree felony,
with an affirmative deadly-weapon finding, see Tex. Penal Code Ann. § 29.03(a)(2), (b) (West 2003), and
capital murder, a capital felony, with an affirmative deadly-weapon finding.  See
id. § 19.03(a)(2), (b) (West Supp. 2010).  The jury sentenced him to life
imprisonment for the aggravated robbery, see id. § 12.32 (West 2003),
and the trial court sentenced him to life imprisonment without parole for the
capital murder, see id. § 12.31(a)(2) (West Supp. 2010), with the
sentences ordered to run concurrently.  By a single issue, appellant contends
the evidence was insufficient to support his conviction for capital murder.[1] 
We affirm. 

I.             
Background

            Appellant and his
co-defendant, Marcus Pena, were tried together for the murder of Jason Garcia. 
The jury found both guilty of aggravated robbery and capital murder.  In the
early morning hours of August 23, 2009, Garcia called appellant and asked for a
ride home from La Caliente, a nightclub in Victoria, Texas.  Appellant was
accompanied by Marcus, Antonio Castillo, and Rolando Pena.[2] 
The four men picked Garcia up.  Earlier in the evening, appellant and Marcus
had been in a fight with Andy Higdon, an acquaintance of Garcia’s.  Because
Garcia had not joined in the earlier fight and did not provide Higdon’s phone
number or address to appellant and the others, they beat him repeatedly and
left him in the parking lot of Magic Industries, a business located in
Victoria.  A summary of relevant trial testimony is presented below.

A.  State’s Evidence 

1.  Leisha Wood

            Leisha Wood, M.D., a medical examiner
with the Travis County Medical Examiner’s Office, testified that she conducted
an autopsy on Garcia’s body and prepared a report.  Dr. Wood testified that
Garcia had a broken nose, significant bruising, and numerous blunt-force
injuries.  Garcia had injuries on all sides of his face and scalp and swelling
of his brain.  His head was distended, an injury consistent with being kicked
in the face.  Garcia also had numerous “defensive-type injuries” on his arms,
which were consistent with an attempt to protect himself.  

            On cross-examination by
appellant’s counsel, Dr. Wood stated that Garcia’s injuries, by themselves, may
not have caused his death.  She clarified, however, that she thought that “the
injuries did cause his death or at least contributed to his death.”  She
further testified, “[h]is injuries caused his death.  Maybe not the direct
injuries themselves, without the heart condition or without the cocaine, maybe
he could have survived—maybe he could have, but the temporal relationship
between injury and his death, you can’t exclude the injuries from his death.” 
She stated that she could not “say for certain” whether Garcia would be alive
if he had not had cocaine and marihuana in his system.  

2.  Eline Moya 

            Eline Moya, a sergeant with the
Victoria Police Department, testified that she was the first officer to report
to the scene where Garcia’s body was found, around 2:15 a.m.  Garcia was found
face-down in the parking lot at Magic Industries; when Sergeant Moya checked,
Garcia did not have a pulse.  When EMS personnel arrived and rolled Garcia
over, Sergeant Moya observed that Garcia had blood on his face and coming out
of his ears.  

3.  Andy James Higdon

            Andy Higdon testified that he had
known Garcia for about a year or two and that they were “cool.”  He saw Garcia
at the Club Westerner on the night Garcia was killed.  Garcia introduced Higdon
to “a dude” as “my home guy, ‘Lunatic,’” (Higdon’s nickname).  The “dude”
responded to Higdon, “[y]ou’re the one that has a problem with our home boy,
Rico?”  Then, Higdon “got hit.”  Security guards ushered Higdon and the others
outside, where Higdon was again assaulted.  Garcia did not participate in the
fight.  When Higdon asked Garcia why he had been assaulted, Garcia said he did
not know.  When the men who assaulted Higdon left, they shouted that they were
members of the Mexican Mafia.  Higdon testified that he does not belong to a
gang.  

4.  Lisa Pena 

            Lisa Pena is married to Rolando and
knows appellant, Marcus, and Castillo.  Lisa and Rolando were at Club Westerner
the night of the incident celebrating a quinceanera for Lisa’s daughter.  After
the celebration ended about midnight, Lisa and Rolando went to the home of
Lisa’s parents for an after-party.  Appellant, Marcus, and Castillo were also
there.  Around 2:00 a.m., Lisa’s father asked them to leave because they were
shouting in the yard.  Appellant, Rolando, Marcus, and Castillo left in Lisa
and Rolando’s white Cadillac.  At the same time, Eina Fernandez left in a
separate car.  Around 5:00 a.m., Eina picked Lisa up at her parents’ house and
drove her to Eina’s house.  Appellant, Marcus, and Rolando were there.  Lisa
went to Eina’s to pick up Rolando and drive her car back to her parents’ house;
Rolando was too intoxicated to drive.  Lisa testified that Rolando said he “got
into some shit.”  Lisa stated that she thinks Rolando is a member of the
Mexican Mafia.  The morning after the quinceanera, Rolando, appellant, and
Marcus went to Corpus Christi in Lisa’s vehicle.  Lisa contacted Rolando’s
aunt, who lived in Corpus Christi, and made arrangements for the men to stay at
her house in Corpus Christi.  Eina and Stephanie Rendon were at Lisa’s house
when the men left.  

5.  Dustin Ferguson

            Dustin Ferguson, a licensed paramedic,
testified that he responded to the 911 call regarding Garcia’s body.  Garcia
was found lying face down in the parking lot.  Garcia had no pulse and did not
respond to emergency measures.  

6.  Stephanie Rendon 

            Stephanie Rendon testified that at the
time of the events at issue, she was appellant’s girlfriend.  In response to
the State’s questions, Rendon stated that she is under indictment for a felony
offense and has an agreement with the State that in exchange for her truthful
testimony, the charges against her could be dismissed.  Rendon testified that
through appellant, she knows Rolando, Marcus, and Castillo.  She also knows
Eina, Marcus’s then-girlfriend, and Lisa.  Rendon stated that she went to the
quinceanera at Club Westerner with appellant.  Marcus and Eina were with them. 
When the club closed around midnight, she and appellant, along with Marcus and
Eina, Eina’s daughter and her friend, and Garcia left together and went to Eina’s
house to drop off Eina’s daughter and her friend.  Then, Rendon and appellant,
Marcus and Eina, and Garcia went to a club, La Caliente.  

            At La Caliente, Rendon saw
Garcia introduce someone she knew by his nickname—“Lunatic”—to appellant and
Marcus; a fight broke out between appellant, Marcus, and “Lunatic.”  She did
not go outside right away and did not see fighting outside.  When she went
outside, she saw a guy shout “Sureno,” which according to Rendon, is Spanish
for “south.”  Rendon and Eina went to the car and picked up appellant and
Marcus down the road.  Garcia stayed at La Caliente.  

            Rendon said the four then
went to the home of Lisa Pena’s parents.  Appellant and Marcus got out and
talked to Rolando.  Castillo was with Rolando.  Appellant, Marcus, Rolando, and
Castillo got into Rolando’s vehicle, a white Cadillac, and left.  Rendon and
Eina followed the men in Eina’s vehicle to another club, the Hideaway.  Garcia
got into Rolando’s car at the Hideaway.  Appellant told Rendon not to follow
them, but she did.  Rolando’s vehicle stopped at Silver City,[3]
and appellant, Marcus, Rolando, Castillo, and Garcia got out.  Rendon saw
Rolando assault Castillo.  Appellant was driving; Rolando was in the front
passenger seat.  Marcus, Castillo, and Garcia were in the back seat with Garcia
in the middle.  Although somewhat unclear as to the sequence of events, Rendon
said they went to the Hideaway first, then to Silver City.  After appellant
told Rendon to go home, she and Eina went to Eina’s house.  

            Forty-five minutes to an
hour later, appellant, Marcus, Rolando, and Castillo returned to Eina’s house. 
Rendon saw that appellant and Marcus had blood on their hands and shirts. 
Appellant, Marcus, and Rolando changed clothes.  Appellant asked Rendon and Eina
to drive to Magic Industries, where they had left Garcia, and check on him. 
Rendon said she thought something had happened to Garcia, but did not ask for
an explanation.  Rendon and Eina drove to Magic Industries.  When they did not
see Garcia, they called appellant, who told them to pick him up.  They drove to
Eina’s, picked appellant up, and drove back to Magic Industries.  Appellant
pointed out where Garcia’s body was.  They then drove back to Eina’s, dropped
off appellant, and drove back to Magic Industries.  

            Rendon said that as she
stood over Garcia’s body, there was a “pile of blood underneath him” and she
was afraid to touch his body.  She called 911, using Eina’s phone.  She
believed that Garcia was dead.  Rendon told the 911 dispatcher that they were
driving by and saw a body and did not know if the victim was alive.  They did
not wait for the ambulance, and went back to Eina’s house.  

            While they were gone,
Castillo had left.  Appellant, Marcus, and Rolando asked Rendon and Eina what
they had seen.  Rendon and Eina said that Garcia was lying face down in a pool
of blood and was not breathing.  Rendon remembered being interviewed by the
police and recalled that the men told her they had beaten Garcia up and may
have hit him too hard.  Rendon said she did not tell the officers the complete
truth before because she was scared.  Rendon said that she saw some of Garcia’s
property with appellant, Marcus, and Rolando; she saw Garcia’s hat, telephone,
and wallet.  The men burned Garcia’s belongings in a barbeque pit at Eina’s
sometime between 4:00 and 5:00 a.m.  Rolando went home when Lisa came to pick
him up.  

            The next day, Rendon,
appellant, Marcus, and Eina went to Lisa’s house.  Appellant, Marcus, and
Rolando left town in Rolando’s white Cadillac.  Appellant later called Rendon
and asked if the police had contacted her.

7.  Ileina Fernandez 

            Ileina “Eina” Fernandez is married to
Marcus and at the time of trial was filing for divorce.  Prior to Garcia’s
murder, she had known appellant for a few weeks.  Eina testified that Marcus
and appellant are members of the Mexican Mafia.  On the night of Garcia’s
murder, Eina attended the quinceanera at the Club Westerner with Marcus,
appellant, Rendon, and Eina’s daughter.  They left the Club Westerner about the
time it closed.  When they left, Garcia was with them.  They dropped Eina’s
daughter off at home and went to La Caliente around 1:00 a.m.  

            At La Caliente, appellant
and Marcus got into a confrontation with someone Eina did not know.  Marcus and
appellant were “yelling out gang signs.”  According to Eina, the man that
appellant and Marcus fought was yelling, “Sureno.”  Eina and Rendon went to the
car and picked up appellant and Marcus.  They then drove to Lisa’s parents’
house because appellant and Marcus wanted to talk to Rolando.  When they
arrived at Lisa’s parents house, appellant and Marcus, who were “mad and upset”
at the person they had confronted at the club, got out; Eina and Rendon stayed
in the car.  Lisa’s parents asked them to leave.  Eina and Rendon left;
appellant, Marcus, and Rolando left in Rolando’s white Cadillac.  

            Rendon and Eina followed
Rolando’s vehicle to a house in Silver City.  Eina remembers seeing Castillo in
Silver City but does not remember how he got there.  In Silver City, there was
a confrontation between Marcus and Castillo.  Rolando, appellant, and Marcus
were arguing with Castillo.  After they left Silver City, the two vehicles went
to the Hideaway to pick up Garcia.  By this time, it was 2:00 a.m. and the
Hideaway was closed.  Garcia got into the back seat of Rolando’s vehicle;
appellant was driving.  When Rolando’s vehicle got close to Eina’s house, it
stopped and the men told Eina and Rendon to go home.  Rendon was angry that the
men were leaving them.  

            About thirty minutes
later, appellant, Marcos, Rolando, and Castillo came back; Garcia was not with
them.  Appellant and Marcus had blood on their clothing.  Eina saw that Rolando
had a wallet.  The wallet had $20 in it.  Rendon put the bloody clothing in the
washing machine.  Marcus and appellant said that they had beaten Garcia with
their fists.  Marcus asked Eina to check on Garcia and take him to the
hospital.  Rendon and Eina went to the Magic Industries parking lot to look for
Garcia’s body but did not see anything.  They drove back to the house and
reported that they could not find Garcia.  Appellant got into the car and at
the Magic Industries site, pointed to the area where Garcia’s body should be. 
Instead of checking on Garcia at that time, appellant instructed the women to
take him back to Eina’s house.  After doing so, appellant instructed Eina and
Rendon to go back and take Garcia to a hospital.  When Eina and Rendon
returned, Garcia was lying face down with a lot of blood under his face. 
Garcia did not respond, and Eina thought he was not breathing.  

            Eina told Rendon to call
911.  After calling 911, they left.  The women saw the ambulance arrive as they
were leaving.  When they returned to the house, they told the men they had
called 911.  The men told them to “not say nothing.”  Eina saw the men building
a fire in the barbeque pit but did not inquire as to what they were doing
because she did not want to know.  

            Eina said that when she
was questioned by the police, she said she had received an anonymous call about
Garcia’s body.  She lied because she was afraid of Marcus and his friends. 
Eina did not permit the police to search her house because she was protecting
Marcus.  

            The next day, appellant,
Marcus, and Castillo asked her to take them to Rolando’s house.  Eina said that
appellant and Marcus were going to leave town, along with Rolando.  Marcus said
they were leaving town because “of what they did.”  Appellant, Marcus, and
Rolando left in Rolando’s white Cadillac.  Marcus called her several times and
asked if she had talked to law enforcement.  At some point, Eina permitted the
police to search her house and garage.  The police found a burned cell phone in
the barbeque pit and found shoes in the washing machine.  

            On cross-examination, Eina
said that Marcus, appellant, and Rolando had suggested that she check on Garcia
and take him to the hospital.  

8.  Alice Avalos

            Alice Avalos testified that she is
Rolando’s aunt.  In August 2009, Rolando, appellant, and Marcus drove to her
house in Corpus Christi in Rolando’s white Cadillac.  Avalos testified that
after a few days, she knew something was wrong.  Marcus was nervous.  Marcus
and Rolando offered to sell her a watch for twenty dollars and Marcus tried to
sell her a diamond necklace for twenty dollars.  During the time the men were
there, Avalos went to the grocery store with her friend, Connie Cuellar. 
Cuellar bought five bottles of hydrogen peroxide for Rolando.  At some point,
the men were going to leave in a van with appellant’s brother.  

9.  Rolando Pena Jr.[4]

            Rolando testified that he is
associated with the Mexican Mafia.  Appellant, Castillo, and Marcus were also
associated with the Mexican Mafia.  Rolando stated that appellant was
previously a member of another street gang, the North Side Klan.  Rolando
testified that appellant and Rendon, Marcus and Eina, and Castillo attended the
quinceanera at the Club Westerner.  Garcia, whom Rolando had known since middle
school, was also at the quinceanera.  

            After the party ended,
Rolando and Lisa went to the home of Lisa’s parents, where an after-party was
planned.  Castillo and his wife, Jessica, also came to the house.  Sometime
later, appellant, Rendon, Marcus, and Eina arrived at the house.  Appellant and
Marcus got out and told Rolando that they had gotten into a fight at a club
because Garcia had introduced them to Andy (Higdon) and Marcus did not like Andy
and started a fight.  Rolando said that appellant and Marcus were still “hyped
up” and wanted to fight Andy and those he hung around with, known as the South
Side Locos.

            Appellant, Marcus,
Castillo, and Rolando left in Rolando’s vehicle.  The men drove to Silver City
where they attempted to obtain some guns from someone known as “Juanito.” 
Rolando said they intended to look for members of the South Side Locos. 
Rolando explained that they felt that the South Side Locos had “disrespected”
appellant and Marcus by fighting at the club.  While there, an argument broke
out, and appellant, Marcus, and Rolando hit Castillo.  The four men then left
the Silver City area.  Rolando got a phone call from Garcia, who wanted a ride
home from La Caliente.  The men told him to meet them at the Hideaway, a nearby
club.  The men noticed that Eina was following them in her vehicle; appellant
got out and told them to go home.  

            At the Hideaway, they
picked Garcia up and he got in the middle of the back seat.  They asked Garcia
what had happened to “Lunatic” (Higdon) after the earlier fight.  Garcia said
that “Lunatic” had been hit by a bottle and was going to the hospital.  They
asked Garcia for Higdon’s address and phone number; when Garcia said he did not
know, they assumed he was lying to protect Higdon.  Marcus and Castillo, who were
in the back seat with Garcia, began to punch Garcia.  Garcia said he was not
lying and asked Rolando if he was going to “let this go down.”  Garcia was
being beaten repeatedly by Marcus and Castillo.  Garcia tried unsuccessfully to
get out of the vehicle.  Rolando told appellant to pull over.  When Rolando got
out, he intended to hit Garcia, but when he saw Garcia was covered in blood, he
“just yanked him out of there, so we could go.”  Garcia fell out of the car on
all fours.  The other three men got out.  Castillo was near Garcia’s feet;
appellant and Marcus were near Garcia’s head.  Appellant and Marcus started
hitting and punching Garcia; Rolando stood by.  Rolando said he had intended to
hit Garcia when they stopped the car, but when he saw all the blood, he changed
his mind.  Castillo also stood by while appellant and Marcus hit and kicked
Garcia in the face and upper body area with their hands and feet.  Garcia was
not talking, but was moaning from the pain.  Rolando did not see anyone take
Garcia’s necklace, watch, or wallet.  The beating took place in the parking lot
of Magic Industries.  Marcus said that he tried to get Garcia’s boots off, but
could not.  Garcia’s body was at the rear of the vehicle when they got back
in.  Appellant said he was going to run over Garcia’s body, but Rolando told
him not to because he would get “stuff under the car” and they would not be
able to clean it up.  Rolando said that Garcia’s condition appeared to be
“major” and that he appeared to need medical attention.  The men drove to
Eina’s house.  Rolando said he talked about calling 911 but did not do so
because he did not want to be caught.  

            When they got to Eina’s
house, they washed the blood off, and appellant and Marcus changed clothes. 
Rolando stated there was a lot of blood in the car.  Appellant and Marcus told
Eina and Rendon to go check on Garcia.  They came back and appellant went with
them to show them the location of the body.  One of the women called 911.  When
asked if running over a person with a vehicle posed a danger of killing that
person, Rolando said, “[y]es.”  When Rolando last saw Garcia, he believed
Garcia was “pretty bad hurt” and “needed some help fast” or he “wasn’t going to
make it.”  He clarified that Garcia’s condition “looked like he would die if he
didn’t get immediate help.”  Rolando stated that appellant later bragged about
his hands being deadly weapons.  

            When Rendon and Eina
returned to the house, they ate some tacos.  Castillo had left.  Rolando stated
that from the time they left Garcia in the parking lot to the time that Rendon
and Eina returned to the house, thirty minutes or more had elapsed.  While they
were eating, no one talked about Garcia.  While the women were looking for
Garcia’s body, Rolando, appellant, and Marcus wiped the blood out of the inside
of the car with wet towels.  While at Eina’s house, Marcus showed them Garcia’s
wallet, which contained about twenty dollars.  At some point, appellant told
him that they had burned Garcia’s cell phone, wallet, and cap in a barbeque pit
at Eina’s house.  Castillo’s wife picked him up at Eina’s house.  Rolando’s
wife, Lisa, picked Rolando up.  When he got home, Rolando cleaned the car again
with a towel.  When Lisa asked him what was going on, he told her it was none
of her business.  

            The next day, Rolando
received a phone call from “J.P.”, one of Garcia’s cousins, inquiring about
Garcia.  Rolando told him he did not know what happened to Garcia.  The morning
after Garcia’s death, appellant, Marcus, and Rolando met at Rolando’s house so
they could all go to Corpus Christi to Rolando’s aunt’s house.  When they
arrived at the house in Corpus Christi, they parked the car in the back to hide
it.  The men were in Corpus Christi for six days before they were picked up
there.  While in Corpus Christi, they cleaned the car several more times with
water and towels and hydrogen peroxide.  They also removed the seat belts and
floor mats from the vehicle and threw them away.  They believed that they had
completely cleaned the vehicle.  While in Corpus Christi, Marcus told them he
had taken Garcia’s jewelry and had tried to take his boots.  They tried to sell
the jewelry to Rolando’s aunt, but she did not want it.  On the day they were
arrested in Corpus Christi, appellant’s brother had come to pick him up in a
mini-van.  The three men got into the mini-van because they were trying to get
to Mexico through Laredo.  As they were traveling out of Corpus Christi, they
were surrounded by law enforcement officers and arrested.  

            Rolando stated that
appellant was the last one to kick Garcia and that Garcia gave “an ugly moan.” 
According to Rolando, “that’s what hurt him right there real bad.”  Rolando
said the blow sounded different from the other blows.  Rolando testified that
appellant said that if Garcia was dead, he would “take the rap” for it.  

            On cross-examination,
appellant’s counsel attempted to impeach Rolando’s credibility by pointing out
discrepancies between Rolando’s earlier statement to the police and his trial
testimony.  Rolando testified that he did not see appellant take anything from
Garcia or order anyone else to take Garcia’s property.  Rolando stated that he
is pleading guilty to murder even though he did not intentionally or knowingly
kill Garcia.  Rolando testified that there was not a formal plan to kill
Garcia.  Rolando stated that Castillo and Marcus, who were in the back seat
with Garcia, initiated the “punishment” for Garcia’s failure to provide
information about Higdon.  Rolando stated that they did not plan to kidnap, rob,
or murder Garcia. 

            On re-direct examination,
Rolando agreed that he intended to plead guilty to murdering Garcia because he
agreed that beating and kicking a man on all fours was intentionally and
knowingly killing him. 

10.  Antonio Castillo Jr.[5]


            Antonio Castillo’s testimony regarding
the events did not differ significantly from Rolando’s testimony.  Castillo
testified that he “made a stupid decision to go along with these guys.” 
Castillo said that Garcia was beaten up in the back seat because he did not
participate in the fight at La Caliente.  He said Marcus was yelling, “‘He
didn’t jump in, he didn’t jump in’—You know, ‘Let’s fuck this dude up.’” 
Castillo said he “went along with them” because if he had not, he would have
been next.

            Castillo testified that
after they stopped the car at Magic Industries and pulled Garcia out of the
car, he hit Garcia a few times in the back and kicked him.  Marcus was kicking
and hitting Garcia in the head with his hands and feet.  Appellant was hitting
Garcia in the head and face.  Rolando was hitting Garcia in the back with his
hands and feet.  He stated that appellant and Marcus kicked and hit Garcia the
most in the head and face.  When they left Garcia, he was not talking or
moving.  According to Castillo, appellant and Marcus were “putting their whole
body into it” “with full force, kicks and punches.”  At some point, Castillo
and Rolando stopped hitting and punching Garcia, but appellant and Marcus did
not stop.  

            Castillo was asked by the
prosecutor, “If you were kicking someone in the head, as hard as you could,
they’re already senseless or semi-conscious or non-responsive, would it be your
intent to harm or would you be kicking to kill?”  Castillo responded, “I guess
you could say, to kill the person.”  He also stated that as hard as appellant
and Marcus were kicking Garcia, “it was like they were going to kill him.”  As
they got back into the car, Castillo saw appellant searching through Garcia’s
pockets.  When they left Garcia, he was unconscious.  

            After they got back into
the car, they went to Eina’s house.  Castillo’s wife picked him up shortly
thereafter.  Castillo stated that appellant, Marcus, and Rolando had sent him
signals to keep his mouth shut.  Castillo testified that at one point,
appellant and Marcus had asked him if he was “talking” and said that if he
testified, “you know what it is.”  Castillo took the comment to mean that they
“were going to come after [him]” if he testified against them. 

            On cross-examination by
appellant’s counsel, Castillo admitted that no one ever said, “Let’s kill Jason
Garcia.”

II.           
Sufficiency of Evidence 

            By his sole issue,
appellant contends that the evidence is insufficient to support his conviction
because:  (1) the State failed to prove that he had the specific intent to
cause Garcia’s death; and (2) Garcia’s death was caused by intervening
circumstances, not appellant’s specific acts or omissions.[6] 
With respect to the first argument, other than citing to general authority that
the State must prove a circumstantial case, appellant’s brief does not cite any
authority, cite any portion of the record, or otherwise discuss his contention
that the State failed to prove the intent element of capital murder.  See Tex. R. App. P. 38.1(i).  With regard
to his argument that Garcia’s death was caused by intervening circumstances,
appellant relies on Dr. Wood’s testimony that Garcia had sufficient heart
disease that the trauma of the assault could have caused him to suffer a heart
attack.  

A.    Standard of Review
and Applicable Law

            The court
of criminal appeals has held that there is “no meaningful distinction between
the Jackson v. Virginia legal sufficiency standard and the Clewis factual-sufficiency
standard” and that the Jackson standard “is the only standard that a
reviewing court should apply in determining whether the evidence is sufficient
to support each element of a criminal offense that the State is required to
prove beyond a reasonable doubt.”  Brooks v. State, 323 S.W.3d 893,
902–03, 912 (Tex. 2010) (plurality op.) (citing Jackson v. Virginia, 443
U.S. 307, 319 (1979)).  Accordingly, we review claims of evidentiary
sufficiency under “a rigorous and proper application of the Jackson standard
of review.”  Id. at 906–07, 912.  Under the Jackson standard,
“the relevant question is whether, after viewing the evidence in the light most
favorable to the prosecution, any rational trier of fact could have found the
essential elements of the crime beyond a reasonable doubt.”  Jackson,
443 U.S. at 319; see Brooks, 323 S.W.3d at 898–99 (characterizing the Jackson
standard as:  “Considering all of the evidence in the light most favorable
to the verdict, was a jury rationally justified in finding guilt beyond a
reasonable doubt”).  The standard for reviewing a challenge to the legal sufficiency
of the evidence is the same for both direct and circumstantial evidence cases. 
Hernandez v. State, 198 S.W.3d 257, 261 (Tex. App.—San Antonio 2006,
pet. ref’d).

            We
measure the legal sufficiency of the evidence by the elements of the offense as
defined by a hypothetically correct jury charge.  Coleman v. State, 131
S.W.3d 303, 314 (Tex. App.—Corpus Christi 2004, pet. ref’d) (citing Malik v.
State, 953 S.W.2d 234, 240 (Tex. Crim. App. 1997)).  “Such a charge [is]
one that accurately sets out the law, is authorized by the indictment, does not
unnecessarily increase the State’s burden of proof or unnecessarily restrict
the State's theories of liability, and adequately describes the particular
offense for which the defendant was tried.”  Villarreal v. State, 286
S.W.3d 321, 327 (Tex. Crim. App. 2009) (quoting Malik, 953 S.W.2d at
240).  

            A person
commits capital murder if he intentionally or knowingly causes the death of an
individual and intentionally commits the murder in the course of committing or
attempting to commit, among other things, kidnapping.  Tex. Penal Code Ann. § 19.02(b)(1) (West 2003), § 19.03(a)(2)
(West Supp. 2010); Hernandez, 198 S.W.3d at 261.  Capital murder is a
result-of-conduct oriented offense; the crime is defined in terms of one’s
objective to produce, or a substantial certainty of producing, a specified
result, i.e., the death of the named decedent.  Roberts v. State, 273
S.W.3d 322, 329 (Tex. Crim. App. 2008).  “A person acts intentionally, or with
intent, with respect to the nature of his conduct or to a result of his conduct
when it is his conscious objective or desire to engage in the conduct or cause
the result.”  Tex. Penal Code Ann.
§ 6.03(a) (West 2003).  “A person acts knowingly, or with knowledge, with
respect to a result of his conduct when he is aware that his conduct is
reasonably certain to cause the result.”  Id. § 6.03(b).  

            In
deciding whether the defendant had the culpable mental state to commit murder,
the jury weighs the evidence introduced at trial.  Childs v. State, 21
S.W.3d 631, 635 (Tex. App.—Houston [1st Dist.] 2000, pet. ref’d).  A
person’s knowledge and intent may be inferred from the “acts, words, and
conduct of the accused.”  Sholars v. State, 312 S.W.3d 694, 703 (Tex.
App.—Houston [1st Dist.] 2009, pet. ref’d); see Hart v. State, 89 S.W.3d
61, 64 (Tex. Crim. App. 2002).  It may also be inferred from the extent of the
victim’s injuries, the method used to produce the injuries, and the relative
size and strength of the parties.  Patrick v. State, 906 S.W.2d 481, 487
(Tex. Crim. App. 1995).  In a murder case, a particularly brutal or ferocious
mechanism of death, inflicted on a helpless victim, can be controlling upon the
issue of intent or knowledge.  Martin v. State, 246 S.W.3d 246, 263 (Tex.
App.—Houston [14th Dist.] 2007, no pet.) (concluding evidence of severe brain
injuries was legally and factually sufficient to show intent to kill
ten-month-old and support a capital murder conviction).  Intent and knowledge
are fact questions for the jury, and are almost always proven through evidence
of the circumstances surrounding the crime.  Childs, 21 S.W.3d at 635.  Intent
to kill may be inferred from the use of a deadly weapon.  Henderson v. State,
825 S.W.2d 746, 749 (Tex. App.—Houston [14th Dist.] 1992, pet. ref'd).

            “A person
is criminally responsible as a party to an offense if the offense is committed
by his own conduct, by the conduct of another for which he is criminally responsible,
or by both.  Tex. Penal Code Ann. §
7.01(a) (West 2003).  A person is “criminally responsible” for an
offense committed by the conduct of another if, acting with intent to promote
or assist the commission of the offense, he solicits, encourages, directs,
aids, or attempts to aid the other person to commit the offense.  Id. § 7.02(a)(2). 
Evidence is sufficient to convict under the law of parties where the accused is
physically present at the commission of the offense and encourages its
commission by words or other agreement.  Hernandez, 198 S.W.3d at 261.  In
determining whether an accused participated as a party, the fact finder may
examine the events occurring before, during, and after the commission of the
offense and may rely on actions of the accused that show an understanding and
common design to commit the offense.  Id.  Further, circumstantial
evidence may be used to prove party status.  Id.

            Here, the
jury was instructed that it could find appellant guilty of capital murder as a
principal or as a party.  The jury returned a general verdict; therefore, if
the evidence is sufficient to support a finding under either of the allegations
submitted, we must uphold the jury’s verdict.  See id.  

            The jury
was also given an accomplice-witness instruction and instructed that Rolando
and Castillo were accomplices.  See Tex.
Code Crim. Proc. Ann. art. 38.14 (West 2005).[7] 
Appellant has not raised an issue challenging the sufficiency of the
non-accomplice witness testimony.

B.     Discussion

            As noted
above, appellant does not cite any portion of the record in support of his
assertion that neither he, Marcus, Rolando, or Castillo, intentionally or
knowingly killed Garcia.  Rolando testified that:  (1) appellant and Marcus
kicked and beat Garcia repeatedly in the face, head, and upper body area with
their hands and feet; (2) Garcia looked like he would die if he did not get
immediate help; (3) appellant wanted to run over Garcia’s body with the car,
but Rolando did not want to get Garcia’s DNA underneath the car; (4) none of
the men called 911, and Garcia was left unresponsive in the parking lot for at
least thirty minutes before Rendon and Eina called 911; (5) appellant, Marcus,
and Rolando cleaned Garcia’s blood out of the vehicle and burned Garcia’s cap,
wallet, and cell phone; and (6) appellant, Marcus, and Rolando left the morning
after the murder to stay in Corpus Christi and were attempting to escape to
Mexico when they were apprehended.  Castillo testified that:  (1) appellant and
Marcus kicked Garcia the most in the head and face; (2) if a person continues
to kick in the head someone who is already senseless and non-responsive (as
appellant and Marcus did), the intent is to kill; and (3) Marcus and appellant
were kicking Garcia so hard that “it was like they were going to kill him.” 
Castillo also testified that before Garcia was pulled out of the car, Marcus
was yelling, “[l]et’s fuck this dude up.” 

            Although
the jury was required to corroborate the accomplice-witness testimony of
Rolando and Castillo, see Tex.
Code Crim. Proc. Ann. art. 38.14, there was sufficient other evidence
tending to connect appellant to the offense.  “‘[P]roof that the accused was at
or near the scene of the crime at or about the time of its commission, when
coupled with other suspicious circumstances, may tend to connect the accused to
the crime so as to furnish sufficient corroboration to support a conviction.’”  Smith
v. State, 332 S.W.3d 425, 443 (Tex. Crim. App. 2011) (quoting Richardson
v. State, 879 S.W.2d 874, 880 (Tex. Crim. App. (1993)).  Moreover, a
defendant’s behavior or actions prior to or following an offense may tend to
connect the defendant with the commission of the offense.  Id. at 445. 
Here, Eina and Rendon testified that:  (1) Marcus and appellant said they had
beaten Garcia with their fists; (2) the men burned Garcia’s belongings in a
barbeque pit at Eina’s; and (3) appellant, Marcus, and Rolando left town the
next morning because of “what they did.”  This was sufficient to tend to
connect appellant to the commission of the offense.  A jury may infer intent
from any facts that tend to prove its existence, such as the acts, words, and
conduct of the defendant.  Sholars, 312 S.W.3d at 703.  The jury was
free to infer that appellant intended to kill Garcia when he and Marcus
continued to kick and beat him in the head and face after Garcia was
semi-conscious and unresponsive and when appellant wanted to run over Garcia’s
body with the vehicle.  We conclude that the evidence is legally sufficient to
support the jury’s finding that appellant intentionally or knowingly killed
Garcia.

            Secondly,
appellant argues the evidence is insufficient because Garcia’s death was caused
by intervening circumstances.  We construe appellant’s argument as a challenge
to the causation element of the offense.  Appellant relies on Dr. Wood’s
testimony that (1) Garcia was obese and had moderate heart disease, (2) had
cocaine and marihuana in his system, and (3) the injuries sustained by Garcia
were not so severe that anyone sustaining the injuries would necessarily have
died.  We find appellant’s argument to be without merit.  Dr. Wood also
testified that although the trauma of the assault could have caused Garcia to
suffer a heart attack, “it’s still the blunt force injuries he sustained, even
if he had a heart attack, that would be his cause of death.”  She testified
that the injuries sustained by Garcia could cause death in a healthy person
without heart disease, and that in this case, Garcia’s “injuries did cause his
death or at least contributed to his death.”  It was the jury’s role to
reconcile conflicts, contradictions, and inconsistencies in the evidence, and
to judge the credibility of witnesses.  See Brooks, 323 S.W.3d at 900; Brown
v. State, 270 S.W.3d 564, 568 (Tex. Crim. App. 2008).  We afford almost
complete deference to these determinations.  See Lancon v. State, 253
S.W.3d 699, 704–05 (Tex. Crim. App. 2008).  We conclude that the evidence was
legally sufficient to support the causation element of the offense.

            Viewing
all of the evidence in the light most favorable to the verdict, we conclude
that the evidence is legally sufficient for a rational jury to find beyond a
reasonable doubt that appellant intentionally or knowingly killed Garcia and intentionally
committed the murder in the course of committing kidnapping.  See Jackson,
443 U.S. at 318-18; Brooks, 323 S.W.3d at 895.  Viewing all of the
evidence in the light most favorable to the verdict, we also conclude that the
evidence is legally sufficient for a rational jury to find beyond a reasonable
doubt that appellant, acting as a party, intentionally or knowingly caused
Garcia’s death.  See Jackson, 443 U.S. at 318-18; Brooks, 323
S.W.3d at 895.  Thus, the evidence was legally sufficient to support
appellant’s conviction.  We overrule his sole issue.  

IV. 
Conclusion

            We affirm the
trial court’s judgment. 

 

 

DORI CONTRERAS GARZA

Justice

 

Do
not publish.

Tex. R. App. P.
47.2(b)

Delivered
and filed the

31st
day of August, 2011.









[1]
Appellant’s brief states incorrectly that appellant was convicted of “capital
murder and engaging in criminal activity (underlying offense aggravated
robbery)” and asserts that “in both charges, capital murder and engaging in
organized criminal activity, the State has failed to prove its case . . . .” 
The brief does not address appellant’s conviction for aggravated robbery. 
Accordingly, we construe appellant’s brief as challenging only the sufficiency
of the evidence supporting his conviction for capital murder. 

 





[2]
Testimony at trial showed that Marcus Pena and Rolando Pena are cousins.





[3]
Although not otherwise described in the record, Silver City is apparently a
nearby neighborhood or community.  





[4]
The record shows that Rolando Pena had a pending indictment concerning the
events leading to Garcia’s death.  Rolando had a plea agreement with the State
to plead guilty to Garcia’s murder and provide truthful testimony in this case
in exchange for a sentence recommendation of forty years.  





[5]
Castillo testified that he has an agreement with the State to plead guilty to
engaging in organized criminal activity or capital murder in exchange for a
sentencing recommendation of twenty years.  





[6]
We construe appellant’s second argument as a challenge to the causation element
of the offense.





[7]
Article 38.14 provides that “[a] conviction cannot be had upon the testimony of
an accomplice unless corroborated by other evidence tending to connect the
defendant with the offense committed; and the corroboration is not sufficient
if it merely shows the commission of the offense.”  Tex. Code Crim. Proc. Ann. art. 38.14 (West 2005).